*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-11-0000350
12-AUG-2015
08:20 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

In the Matter of the Arbitration

of

NORDIC PCL CONSTRUCTION, INC., fka NORDIC CONSTRUCTION, LTD.,
Respondent/Claimant/Counterclaim Respondent-Appellant,

vs.

LPIHGC, LLC,
Petitioner/Respondent/Counterclaimant-Appellee.

SCWC-11-0000350

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0000350; S.P. NO. 10-1-0346)

AUGUST 12, 2015

NAKAYAMA, ACTING C.J., McKENNA, AND POLLACK, JJ.,
CIRCUIT JUDGE ALM, IN PLACE OF RECKTENWALD, C.J., RECUSED, AND
CIRCUIT JUDGE SAKAMOTO, IN PLACE OF WILSON, J., RECUSED

AMENDED OPINION OF THE COURT BY McKENNA, J.

I.    Introduction

Petitioner/Counterclaimant-Appellee LPIHGC, LLC ("LPIHGC")

seeks review of the April 4, 2014 Judgment on Appeal of the

Intermediate Court of Appeals ("ICA"), entered pursuant to its

February 14, 2014 Memorandum Opinion, which vacated and remanded the March 24, 2011 Final Judgment ("judgment") of the Circuit Court of the First Circuit ("circuit court") in favor of LPIHGC and against Respondent/Claimant-Appellee Nordic PCL Construction, Inc. fka Nordic Construction Ltd. ("Nordic").

The circuit court's judgment was based on its grant of LPIHGC's motion to confirm, and denial of Nordic's motion to vacate, the Partial Final Award of Arbitrator dated October 15, 2010 ("the Partial Award") and the Final Award of Arbitrator dated December 15, 2010 ("the Final Award") (the Partial Award and the Final Award are sometimes collectively referred to as "the Arbitration Award").  The Arbitration Award was issued by the arbitrator selected by the parties, retired circuit court judge Patrick K.S.L. Yim ("the Arbitrator").  On appeal, the ICA ruled that the Arbitrator's failure to disclose various relationships with the law firms of LPIHGC's attorneys established a reasonable impression of partiality requiring vacatur of the Arbitration Award.

The "evident partiality" bases for vacatur alleged by Nordic present various questions of disputed material facts.  The circuit court denied Nordic's motion without orally stating its reasoning on the record or entering any findings of fact and conclusions of law.  As this court ruled in Clawson v. Habilitat,

2

Inc., 71 Haw. 76, 783 P.2d 1230 (1989), "whenever material facts are in dispute in determining whether an arbitration award should be vacated, the circuit court should conduct an evidentiary hearing and render findings of fact and conclusions of law in support of granting or denying [a] motion to vacate [an] arbitration award."  71 Haw. at 79, 783 P.2d at 1232.

In this case, although neither party requested an evidentiary hearing to address disputed issues of material fact, because the circuit court did not explain the basis of its rulings on the record or enter findings of fact or conclusions of law, this court is unable to determine whether the circuit court erred in denying Nordic's motion to vacate.  Specifically, with respect to the "evident partiality" bases of Nordic's motion, it is unclear whether the circuit court found no violation of the Arbitrator's duties of reasonable inquiry, disclosure, or continuing duty to disclose; found that despite a violation, the objection was not timely or had been waived; or found that despite a showing of evident partiality and timely objection without waiver, it exercised its discretion not to vacate the award.  Thus, the factual and/or legal bases upon which the circuit court denied the motion to vacate are unascertainable.  Because we are unable to determine the grounds on which the circuit court based its decision, we are unable to appropriately

3

review its ruling.[1]

Accordingly, we vacate the ICA's April 4, 2014 Judgment on Appeal, and the circuit court's March 24, 2011 Final Judgment, thereby vacating the associated orders (1) granting LPIHGC's motion to confirm the Arbitration Award, and (2) denying Nordic's motion to vacate the Arbitration Award, and remand this case to the circuit court for an evidentiary hearing and entry of findings of fact and conclusions of law on Nordic's motion to vacate.[2]

## II.  Background

### A.  Facts

This case arises from a dispute over the adequacy of concrete work Nordic performed on a Maui condominium construction project[3] as a subcontractor to LPIHGC.  The owner of the project, Maui Beach Resort Limited Partnership ("Owner"),[4] incorporated

---

1    At oral argument, counsel for both parties encouraged this court to rule without a remand.  Even if it was appropriate for this court to render findings of fact, which it is not, the record presents too many unaddressed disputed material issues of fact, as discussed below.

2    Neither the circuit court nor the ICA addressed whether there are disputed material issues of fact regarding the other bases on which Nordic moved to vacate the Arbitration Award, which are briefly discussed in this opinion.  If there are, the circuit court must also address those issues.

3    The project is the Honua Kai South Enclave in Lāhainā, Maui.

4    The Owner "consist[ed] of a consortium of different entities including JP Morgan, Intrawest Placemaking and Ledcor Properties, Inc., a Canadian real estate subsidiary of the Ledcor group of companies."  The Owner also hired Ledcor Construction Inc. ("Ledcor") to be the  project construction manager.

LPIHGC to be its general contractor and executed a prime contract between them.  Thereafter, LPIHGC and Nordic executed a written subcontract, which provided for a contract price of $39,2689,396 (as amended) to perform the concrete work for the project.  The parties subsequently disputed whether Nordic's concrete work was adequately flat and level, and LPIHGC made only partial payment to Nordic under the subcontract.

The subcontract contained a binding arbitration clause, which provided for the arbitration to be governed by Hawaiʻi Revised Statutes ("HRS") chapter 658A (Supp. 2010) and conducted by Dispute Prevention & Resolution, Inc. ("DPR").  In addition, it provided for the arbitration to be conducted "by a single arbitrator, who shall either be a former judge with substantial experience in residential real estate litigation matters or a licensed attorney with at least ten (10) years experience in residential real estate transactions and/or litigation involving residential real estate."

In the arbitration hearings, Nordic was represented by attorneys Anna H. Oshiro ("Oshiro"), Mark M. Murakami, and Noelle B. Catalan of Damon Key Leong Kupchak Hastert ("Damon Key").  Although he did not appear at the hearings, the name of attorney Kenneth R. Kupchak ("Kupchak") of Damon Key also began appearing on Damon Key's correspondence and pleadings after the issuance of

the Arbitrator's October 15, 2010 Partial Award.  LPIHGC was

represented by Terence J. O'Toole ("O'Toole") and Judith Ann

Pavey ("Pavey") of Starn O'Toole Marcus & Fisher ("Starn

O'Toole") and John P. Manaut ("Manaut") of Carlsmith Ball LLP

("Carlsmith Ball").

### B.   Arbitration

### 1.   Initial Disclosures and Arbitration Proceeding

After his selection by the parties, on March 17, 2009, the

Arbitrator, through DPR, provided the following disclosures by

email:

> [The Arbitrator] is willing and able to serve as Arbitrator
> in this matter and thanks the parties for his selection.
>
> [The Arbitrator] provides the following disclosures for your
> review:
>
>   1.  While serving on the bench, counsel and members of
>       their law firms appeared before me;
>   2.  Since retirement, I have served as a neutral for
>       counsel and members of their law firms;
>   3.  To the best of my knowledge, I do not know anyone
>       involved with LPIHGC, LLC;
>   4.  I served as a neutral in a matter where Nordic was a
>       party.  That matter was concluded at least five years
>       ago;
>   5.  I will provide additional disclosures as necessary
>       throughout this proceeding;
>   6.  These disclosure will not prevent me from serving as a
>       neutral and unbiased Arbitrator.
>
> Any comments regarding this disclosure should be filed in
> writing with DPR by March 20, 2009.

On October 7, 2009, the Arbitrator, through DPR, provided an

additional disclosure pertaining to the inclusion of an

individual on the expert witness lists submitted by the parties

who had appeared before the Arbitrator on matters completed prior

to the arbitration proceeding.[5]  The parties did not respond to the Arbitrator regarding either disclosure.

Arbitration hearings were held intermittently on thirty-one days from January 25, 2010 to April 29, 2010.  In general, the parties contested which of two concrete flatness and levelness standards[6] applied to Nordic's work and whether Nordic had proven its satisfaction of the applicable standard by providing quantitatively sufficient F-meter data to establish its statistical validity.[7]

On October 15, 2010, the Arbitrator issued the Partial Award, ruling in favor of LPIHGC for $9,804,108.27.

---

5    The October 7, 2009 disclosure provided:

[The Arbitrator] has reviewed the Expert Witness Lists submitted by the parties and provides the following supplemental disclosure:

1.  Richard Kozuma has appeared before me in prior matters. To the best of my knowledge, I do not have any matters with him at this time.

2.  This disclosure will not prevent me from serving as a neutral and unbiased Arbitrator.

Any comments regarding this disclosure should be filed in writing with DPR by October 12, 2009.

6    Nordic argued that the applicable standard was floor flatness (FF) 18 and floor levelness (FL) 15, while LPIHGC argued that it was FF 30 and FL 20.

7    The F-Meter is a floor profiling instrument that is manually pulled across the floor to get an F-Number measurement on the finished floor flatness and levelness. *F-Meter: Rolling Floor Profiler*, ALLEN FACE, http://www.allenface.com/F-Meter.html (last visited April 27, 2015).

### 2. Post-Award Demand Letters and Supplemental Disclosures

Two weeks after the Partial Award was issued, Damon Key sent a letter to DPR dated October 29, 2010 requesting

> updated disclosure details . . . including, but not limited to, any and all arbitration or mediation matters involving attorneys from the law firms of either [Carlsmith Ball] or [Starn O'Toole] . . . which [the Arbitrator] has presided over since January 1, 2009 . . . as well as any matter for which [the Arbitrator] is currently being considered or has been contacted to serve as a potential arbitrator or mediator.

Four days later, Oshiro and Kupchak of Damon Key sent another letter to DPR, demanding the Arbitrator's immediate disqualification on the basis of Carlsmith Ball's alleged representation of the Arbitrator and his nondisclosure of that representation. The letter asserted that:

> It has just come to our attention that [the Arbitrator] has had an undisclosed, long standing professional relationship with opposing counsel . . . . We have reason to understand that [the Arbitrator] was represented by Carlsmith Ball, including an attorney working on this case, on at least seven separate occasions over the last ten years. One of these cases was a matter that was ongoing . . . during the term of the parties' recent arbitration proceedings.

This allegation related to Carlsmith Ball's representation of the QLT on unrelated real estate and lease matters on the island of Hawaiʻi. The Arbitrator has served as one of three trustees of the QLT since 2002, and along with the other two trustees, the Arbitrator's name appears as trustee on lawsuits involving the QLT.

On November 4, 2010, Manaut of Carlsmith Ball sent a letter to DPR that characterized Nordic's request for updated disclosure

8

details as "an improper fishing expedition[,]" and asserted that Nordic "never once raised an issue or questioned anything about the sufficiency of any disclosures" prior to the issuance of the Partial Award. Damon Key sent a responsive letter to DPR on the same day, stating neither the Arbitrator nor Manaut had disclosed seven cases in which Carlsmith Ball allegedly represented the Arbitrator, and demanding the Arbitrator's immediate disqualification.

On November 9, 2010, Pavey of Starn O'Toole sent a letter to DPR challenging Nordic counsel's demand for disqualification. On the same day, Pavey also sent a letter to Oshiro requesting information on the timing and circumstances surrounding discovery of the facts underlying Nordic's claim for disqualification.

On November 11, 2010, the Arbitrator provided a post-award supplemental disclosure that detailed his professional and volunteer activities:

> As previously disclosed, I have served as a mediator and an arbitrator in matters in which parties therein were represented by the firms appearing in this arbitration. Though I cannot recall any matter involving [Owner] or LPIHGC, LLC, I do recall serving as an arbitrator in a matter in which I determined that Nordic was the prevailing party.
>
> Further, at the time when I was informed that I was selected as an arbitrator in this matter, I was serving as a neutral in cases in which the Damon Key firm, Carlsmith Ball, and the Starn O'Toole firm represented certain parties therein. During the year and a half course of this arbitration, I served in an additional matter in which Lane Hornfeck of the Starn O'Toole firm represented a party. Sometime during this period, Robert Triantos of Carlsmith Ball entered an appearance on behalf of an additional party in an

arbitration which commenced in 2008. I also, during this period, served as a mediator in a matter in which Carlsmith Ball was a party.

As one of the three Trustees for the [QLT], I hereby disclose that the following are lawyers and law firms retained by the Trust since 2002, when I commenced to serve as a Trustee. The list is as follows: Ashford & Wriston, Cades Schutte Fleming & Wright, Case Bigelow & Lombardi, Carlsmith Ball, Dean Nagamine, Glenn Kimura, John J. Baker, Lloyd Van De Car, Patricia Brady, Imanaka Kudo & Fujimoto, Leighton Wong, Lori M. Ohinata, Suemori & Aipa, Pitluck Kido Stone & Aipa, Watanabe Ing Kawashima & Komeiji, Wesley K.C. Lau, Robert F. Miller, Susan Ichinose, Dwyer Schraff Meyer et al., Jewell & Krueger, Matsubara Lee & Kotake, Rinesmith & Sekeguchi [sic], Torkildson, Katz Fonseca, Godbey Griffiths Reiss Chong, Moseley Biehl Tsugawa et al., Patricia Brady, Tsukazaki Yeh & Moore, O'Conner Playdon & Guben, Paul Johnson Park & Niles, and Raymond Zeason. As a Trustee, I have no personal role in the selection or appointment of attorneys that perform legal services for the [QLT].

As one of the three trustees for the [A] Trusts, I represent that the [A] Trusts have retained legal services from the firm of [B], and attorneys [D], and [E].

I also disclose that I believe Mr. Michael Walsh, Vice President of the [QLT's] Endowment Group, is []Kupchak's brother-in-law.

As a member of [F]'s Board of [G], I have been informed and been permitted to disclose that our institution, at various times in the past, has retained the legal services of [I], [J], and [K].

As a member of the Board of [L] and [M], . . . ., I have recently been informed that [N] have been referred to the following attorneys for services: [O], [P], [Q], [R], and [S].

I have been informed by management of the [QLT] that in recent matters, members of Carlsmith Ball and the Bays Deaver firm have represented parties who have opposed the interests of the [QLT].

. . . .

On November 15, 2010, Damon Key sent a letter to DPR to request further clarification on the matters listed in the supplemental disclosure.

On November 18, 2010, Pavey, O'Toole, and Manaut sent a

letter to DPR opposing Nordic's disqualification demand and objecting to a stay of the arbitration, alleging that the "demand for disqualification is insufficient on its face because [Nordic] failed to even allege, let alone prove, evident partiality on the part of [the Arbitrator]" and the Arbitrator had no conflict based upon Carlsmith Ball's representation of the QLT. Appended to the letter were declarations of Manaut and Edmund W.K. Haitsuka, the Carlsmith Ball attorney handling the Kona land matters for the QLT.

Haitsuka declared that he had not had any ex parte communications with the Arbitrator about any matter prior to, during, or after the arbitration. He also stated that Carlsmith Ball had not represented the Arbitrator in his individual capacity, and that he had never communicated with the Arbitrator on any trustee issues or anything related to the arbitration, and that he had only spoken to the QLT's executive officers and managers. Manaut declared that he had never had any communication with the Arbitrator concerning the QLT, ex parte or otherwise, and that he was not aware that the Arbitrator was a QLT trustee who Carlsmith Ball represented on land matters in Kona in his representative capacity.

By email dated November 18, 2010, DPR further disclosed that the Arbitrator:

11

served as a Mediator in a case where the Damon Key firm represented a party. Counsel for Damon Key was Mark Murakami, Esq. Counsel for the parties mutually selected [the Arbitrator] in 2008, the mediation was held in February, 2009. DPR charged its standard hourly rate of $350/hour. This matter was included in the [initial] disclosure since the final invoice was issued to counsel on March 17,2009.

. . . served as an Arbitrator in a case where John Sopuch, Esq. of the Starn O'Toole firm represented a party. Counsel for the parties mutually selected [the Arbitrator] in 2008. The Award was issued in February, 2009, and the final invoice was issued on March 13, 2009. DPR charged its standard hourly rate of $350/hour.

. . . served as a Mediator in a matter where Lane Hornfeck of the Starn O'Toole firm represented a party. Counsel for the parties mutually selected [the Arbitrator] in June 2009, and the matter closed in August 2009. DPR charged its standard hourly rate of $350/hour.

. . . served as a Mediator in a matter where Carlsmith Ball was a party. Counsel for the parties mutually selected [the Arbitrator] as Mediator in January 2009. The initial mediation session was held on March 6, 2009, and the matter closed in October, 2009. DPR charged its standard hourly rate of $350/hour.

. . . is serving as an Arbitrator in a case where Robert Triantos, Esq. at Carlsmith [Ball] represented a party for a portion of the arbitration proceeding. The case was opened with DPR in 2008 and counsel participating at that time mutually selected [the Arbitrator] as Arbitrator. In July 2009, Mr. Triantos' client was brought into the case via Court Order, Mr. Triantos' client settled out of the case in July, 2010 ([the Arbitrator] was not involved in the settlement discussions), DPR is charging its standard hourly rate of $350/hour.

On December 1, 2010, DPR declined to grant Nordic's request to disqualify the Arbitrator on the grounds it no longer had jurisdiction once the substantive claims were resolved. On the same day, the QLT sent a letter to DPR providing the following information regarding Carlsmith Ball's representation of the QLT since March 2009:

1. That Carlsmith [Ball] has and continues to represent the Trust from time to time on land management and

12

commercial leasehold collection and summary possession matters, including commercial leaseholds in the Kona Industrial Subdivision, Kuakini Center, and the Kona Commons projects of the Trust;

2. That Carlsmith [Ball] does not represent any single member of the Board;

3. That the selection and retention of law firms, including Carlsmith[ Ball], is customarily done at the operation levels within the Trust and not by the Board; and

4. That day-to-day communications between law firms, review of legal work, and review and payment of law firm invoices are handled at the operational levels of the Trust and not by the Board.

Thereafter, on December 15, 2010, the Arbitrator issued the Final Award, which awarded LPIHGC attorneys' fees of $1,317,804.33 and costs of $121,997.94 for a total of $1,439,802.27.

## C.    Circuit Court Proceedings

### 1.    The Motions to Confirm and to Vacate the Arbitration Award

#### a.    LPIHGC's Motion to Confirm Award

On November 22, 2010, LPIHGC filed a motion to confirm the Partial Award ("motion to confirm"), which was supplemented on December 16, 2010 to include the Final Award.  In its motion to confirm and reply to Nordic's opposition to said motion, LPIHGC argued that Nordic failed to allege an undisclosed relationship because there was none, and failed to meet its burden of proving evident partiality.  In addition, LPIHGC alleged that Nordic waived or is estopped from overturning the Arbitration Award because it "knew or should have known of the potential partiality

of an arbitrator but failed to raise an objection . . . prior to the arbitration decision", to the extent that (1) Carlsmith Ball's representation of the QLT as well as the Arbitrator's status as trustee were public knowledge; and (2) Nordic's counsel had actual knowledge of the Arbitrator's trusteeship and chose not to further inquire after the initial, general disclosure. Lastly, LPIHGC contended that the undisputed evidence against Nordic was overwhelming as the specifications for Nordic's work never changed, and various follow-on tradesmen, independent inspectors, and the project structural engineer and architect testified at the arbitration that Nordic's work was substandard.

### b. Nordic's Motion to Vacate Award

On December 21, 2010 Nordic filed a motion to vacate award of arbitrator ("motion to vacate") on the grounds that (1) the Arbitrator acted with evident partiality by failing to disclose his relationship with Carlsmith Ball and of his receipt of payment for neutral services provided to Carlsmith Ball and Starn O'Toole during the pendency of the arbitration; (2) the award was "procured by corruption, fraud and other undue means" and violates "public policy against the destruction and suppression of evidence";[8] and (3) the award exceeds the arbitrator's

---

8    As to the claims of fraud and spoliation of evidence, Nordic argued that the award warranted vacatur under HRS § 658A-23(a)(1) (Supp. 2010) because it was "procured by lies about crucial evidence [LPIHGC] suppressed or
(continued...)

14

authority.[9]

With regard to alleged nondisclosures that form the basis of this appeal, Nordic argued the Arbitrator did not fulfill his initial obligation under HRS § 658A-12 (Supp. 2010) to make a reasonable inquiry and disclose to all parties any facts that a reasonable person would consider likely to affect the Arbitrator's impartiality, including (1) the long-standing and substantial attorney-client relationship between him, as a QLT trustee, and Carlsmith Ball that "included representation in at least seven, undisclosed lawsuits, two of which were actively

_____

(...continued)
destroyed." Nordic alleged that (1) the Arbitrator refused to hear Nordic's spoliation motion regarding LPIHGC's loss of F-meter data and concealment of an expert report procured early in the project that indicated that Nordic's data may be qualitatively deficient; (2) the Arbitrator refused to recognize Nordic's F-meter test results, which he said were based on insufficient data, because he believed LPIHGC witnesses who testified that LPIHGC "lost all of its F-data in a computer crash, so that the remedy prescribed . . . was no longer possible[;]" and (3) the award omitted references to a taped recording that allegedly contained a conversation recorded at an LPIHGC/Ownership meeting of LPIHGC "representatives strategizing about how to keep sensitive documents out of Nordic's hands by erasing tapes, shredding meeting minutes, or copying counsel on every sensitive document" that it wanted withheld, and found no spoliation of the data because "there could be no spoliation unless [Nordic] proved the loss was intentional. Therefore, Nordic argued, the Arbitrator "failed to apply Hawaii's law against spoliation of documents[]" to LPIHGC witnesses' alleged perjury regarding the loss of computer data, which was "critical to [prove] Nordic's concrete compliance – the main issue in the case."

    9    Nordic argued that the Arbitrator exceeded his powers by awarding damages to a non-party to the arbitration to the extent that the award grants damages to LPIHGC/Owner even though LPIHGC and Nordic were the only two parties to the arbitration, and the Owner is not entitled to any damages in the arbitration proceeding as it contracted only with LPIHGC, not Nordic. The Arbitrator found that the subcontract incorporated the prime contract between the Owner and LPIHGC as part of Nordic's subcontract documents. Nordic also argued that the Arbitrator erred in awarding expert fees and other damages that a trial court could not award, thereby disregarding established law on payment for expert testimony, and warranting vacatur under HRS § 658A-23(a)(4).

15

being litigated during the pendency of this case[,]" and (2) three instances during the pendency of the arbitration in which he provided neutral services to other attorneys in Carlsmith Ball and Starn O'Toole, consisting of work (a) as a mediator for Carlsmith; (b) as a mediator in a case involving Starn O'Toole; and (c) as an arbitrator in a matter in which Carlsmith Ball entered an appearance and represented a party. Nordic further argued that the "existence of this special relationship between [the Arbitrator] and [LPIHGC's] counsel creates an irrefutable presumption of bias and partiality."

The only declaration under oath submitted regarding the alleged nondisclosure was that of Oshiro. Oshiro declared that an attached "table of cases filed or defended by the Carlsmith law firm on behalf of the Arbitrator in his capacity as trustee of the [QLT]" "was discovered by [Nordic] in late October, 2010, after which additional inquiry and requests for disqualification were issued." She also declared that "[t]he supplemental information regarding the Arbitrator's ongoing paid services as a neutral for opposing counsel, was a complete surprise - as [Nordic]'s firm had refrained from such solicitation with the expectation that any such solicitation and service would and must be disclosed in the arbitration proceeding, and as the Arbitrator's prior disclosure of neutral services for counsel was

16

plainly couched in the past tense."

On January 14, 2011, LPIHGC filed its memorandum in opposition to the motion to vacate. With regard to the evident partiality claim, LPIHGC argued that "Nordic is asking this Court to make new law by creating a presumption of evident partiality based solely on an alleged nondisclosure, without any specific facts of improper motives or conduct."[10] LPIHGC also argued that Nordic mischaracterizes the relationship between the Arbitrator and Carlsmith Ball by alleging that "the Arbitrator (as trustee) and Carlsmith (as outside counsel) each owe duties to the QLT, therefore the Arbitrator and Carlsmith must owe duties to each other." (emphasis omitted). Moreover, LPIHGC argued that the Arbitrator's initial disclosure ("Since retirement, I have served as a neutral . . . .") is in present-perfect tense and "denotes that [the Arbitrator's] work as a neutral began in the past, continued thereafter, and may still be continuing." Thus, LPIHGC argued that Nordic is the only party with whom the Arbitrator had any prior relationship and highlighted that Nordic failed to

---

10    LPIHGC and Nordic appear to disagree as to whether this is an actual bias or evident partiality case and the burden of proof required. Citing Kay v. Kaiser Foundation Health Plan, Inc., 119 Hawaiʻi 219, 194 P.3d 1181 (App. 2008), Nordic argued that the nondisclosure reasonably creates an impression of bias warranting vacatur, while LPIHGC argues that Nordic "must establish specific facts that indicate improper motives on the part of the arbitrator." (quoting Washburn v. McManus, 895 F. Supp. 392, 396 (D. Conn. 1994) (internal quotation marks omitted), cited in Daiichi Hawaii Real Estate Corp. v. Lichter, 103 Hawaiʻi 325, 342, 82 P.3d 411, 428 (2003)). The applicable standards are discussed below.

disclose that (1) the Arbitrator provided third-party neutral services in a matter involving Damon Key at the time the arbitration commenced, (2) Kupchak and the Arbitrator serve on DPR's arbitrators' panel together, and (3) Kupchak's brother-in-law is a Vice President of the QLT and is one of two executives in charge of the QLT's real estate litigation in which Haitsuka of Carlsmith Ball represented the QLT.

### c. Hearing on the Motions to Confirm and Vacate

On January 25, 2011, the circuit court held a hearing on LPIHGC's motion to confirm and Nordic's motion to vacate.[11]  In addition to its written arguments, Nordic orally argued that LPIHGC was attempting to confuse the issue of evident partiality by arguing the standard applicable to cases where full disclosure had been made, i.e., actual bias.  Nordic further argued that waiver cannot occur when disclosures are insufficient because (1) neutral, as opposed to non-neutral, arbitrators have a higher duty to disclose; and (2) the original disclosure did not provide (a) notice of present and future relationships, and (b) "actual information that would impart actual knowledge."

In response, LPIHGC argued[12] that Daiichi Hawaii Real Estate

---

[11]   The Honorable Patrick W. Border presided

[12]   As to the other bases Nordic raised in its motion to vacate, LPIHGC argued that Nordic misrepresented to the court that none of the F-meter data was produced during the arbitration because the data was attached as an
(continued...)

Corp. v. Lichter, 103 Hawaiʻi 325, 82 P.3d 411 (2003), supplies the guiding standard for evident partiality.  See 103 Hawaiʻi at 342, 82 P.3d at 428 (quoting Washburn, 895 F. Supp. at 399) ("The relationship . . . must be so intimate--personally, socially, professionally, or financially--as to cast serious doubt on the arbitrator's impartiality.").  LPIHGC also argued for a presumption that Nordic knew about Carlsmith Ball's representation of the QLT because it and its counsel "have refused to go on record as to when and how they supposedly discovered that fact . . . ."

In addition, LPIHGC argued that Nordic and its counsel had more "socially, personally intimate" relationships with the Arbitrator than LPIHGC's counsel to the extent that the Arbitrator did not have (1) ex parte communications with LPIHGC counsel, (2) contact with Carlsmith Ball on the QLT matters, or (3) any previous connection or contact with Manaut on this matter.

Neither party, in its briefs or at the hearing, requested an evidentiary hearing so that the circuit court could address disputed issues of fact.  At the close of the hearing, the

(...continued)
exhibit to LPIHGC's reply brief in the arbitration proceeding.  With regard to the taped recording, LPIHGC admitted that the tape discussed shredding the meeting minutes, however, "nothing was shredded [and] [a]ll the tapes and the written minutes were actually turned over to Nordic and to [] [the Arbitrator]."

19

circuit court took the matters under advisement. On March 24, 2011, the circuit court granted LPIHGC's motion to confirm and denied Nordic's motion to vacate without providing its reasoning or entering findings of fact and conclusions of law, then entered judgment accordingly.

### D. Appeal to the Intermediate Court of Appeals

On appeal, Nordic relied heavily on Kay v. Kaiser Foundation Health Plan, Inc., 119 Hawaiʻi 219, 194 P.3d 1181 (App. 2008), to argue that "if an arbitrator disclosed his relationships, the party may seek to disqualify him, but cannot complain if they did not; conversely, if the arbitrator did not make the required disclosure, and the undisclosed relationship is not trivial, the award is presumed to be tainted and must be vacated." Nordic also argued that "it should have had the opportunity to consider whether [QLT's] dual status as the arbitrator's employer and fiduciary, and Carlsmith Ball's client was a conflict" because the Arbitrator also failed to disclose that Carlsmith provided representation on three of the QLT's "major assets" and represented the QLT in four mechanics lien actions, one of which was still ongoing post-award. Moreover, citing Hawaiʻi Probate Rule 42(a) (1995),[13] Nordic argued that Carlsmith Ball's

---

13    Rule 42(a) of the Hawaiʻi Probate Rules provides:

An attorney employed by a fiduciary for an estate,

(continued...)

representation of the Arbitrator in his trustee capacity does not "excuse his nondisclosure, because in addition to his personal financial interest in the [QLT's] continued success, trustees are the legal owners of the trust, and as such they are the named parties to every legal action, and every claim against the QLT is by law a personal action against the trustee." Lastly, Nordic argued that the Arbitrator's initial statement that "I have served" does not "sufficiently disclose that he was presently serving and may serve in the future" in order to put Nordic on notice that it must object.

In its answering brief, LPIHGC argued that Nordic failed to meet its burden to prove specific facts of improper motives, and instead asked for a presumption of evident partiality in contravention of the Hawaiʻi Supreme Court's requirements in Daiichi: that the "contacts be 'intimate' rather than tenuous or remote, that they cast 'serious doubt' on the arbitrator's impartiality, and that the movant prove 'specific facts' of improper motives or conduct."

In reply, Nordic argued that it did not have a duty to

_____

13(...continued)
     guardianship, or trust represents the fiduciary as client as
     defined in Rule 503(a) of the Hawaiʻi Rules of Evidence and
     shall have all the rights, privileges, and obligations of
     the attorney-client relationship with the fiduciary insofar
     as the fiduciary is acting in a fiduciary role for the
     benefit of one or more beneficiaries or a ward.

investigate potential conflicts when neither it nor LPIHGC knew of the Arbitrator's ties to Carlsmith Ball, and thus, could not have waived the claim.

Applying a de novo standard of review, the ICA concluded that the circuit court erred in granting LPIHGC's motion to confirm and denying Nordic's motion to vacate because "[the Arbitrator's] nondisclosures constitute 'evident partiality' requiring vacatur of the Award under HRS § 658A-23(a)(2)." Nordic, mem. op. at 8 (quoting Kay, 119 Hawaiʻi at 224, 194 P.3d at 1186). The ICA relied heavily upon Kay, and Valrose Maui, Inc. v. Maclyn Morris, Inc., 105 F. Supp. 2d 1118 (D. Haw. 2000) ("VMI"). Repeating its conclusion in Kay, the ICA stated that "an arbitrator cannot, as part of a long-standing and on-going activity, ask for and receive money from a party during the arbitration, without disclosing that fact to the other party." Id. (quoting 119 Hawaiʻi at 230, 194 P.3d at 1192) (internal quotation marks omitted). The ICA also applied the holding in VMI to conclude that "arbitrators must take special care to disclose business or similar dealings with parties, or their counsel, that occur during the pendency of arbitration proceedings." Nordic, mem. op. at 13.

The ICA rejected LPIHGC's waiver argument and concluded that "[t]o the extent that there is no showing that Nordic was aware

22

of [the Arbitrator's] contemporaneous work as a neutral with Carlsmith Ball and Starn O'Toole prior to issuance of the Award, Nordic has not waived its right to claim evident partiality." Nordic, mem. op. at 17. According to the ICA, although the initial disclosure provided some notice of the Arbitrator's role as neutral, it failed to raise the issue of the Arbitrator's role as QLT trustee and Carlsmith's representation of the QLT. Id.

Therefore, the ICA held that the Arbitrator's cumulative failure to "disclose his contemporaneous work as neutral in three separate matters for [LPIHGC's] law firms[]" and "that, in the course of his service as a QLT trustee, the QLT was represented by Carlsmith Ball in several litigation matters, including some that were contemporaneous with the arbitration proceeding" sufficiently established a reasonable impression of partiality, warranting vacatur of the award. Nordic, mem. op. at 14, 15; accord id. at 18. Accordingly, the ICA vacated the circuit court's confirmation of the award and judgment, and remanded for further proceedings consistent with its Memorandum Opinion. Nordic, mem. op. at 18.

Because the award was vacated solely on the issue of nondisclosure, the ICA did not address Nordic's claims that the Arbitration Award was procured by fraud or undue means, or that the Arbitrator exceeded his powers. Id.

23

### E. Certiorari Proceedings

### 1. LPIHGC's Application

LPIHGC presents the following questions in its application for writ of certiorari:

> A. Did the ICA err by creating and retroactively applying a new standard for finding evident partiality under HRS § 658A-23 where:
>
>> 1. The only statutory presumption for finding evident partiality involves undisclosed relationships between an arbitrator and a party, see HRS § 658A-12(e); no statutory presumption exists for a relationship between an arbitrator and counsel for a party;
>>
>> 2. Evident partiality could only have been presumed from the relationship with counsel, which is contrary to the governing statute and highly prejudicial to [LPIHGC];
>>
>> 3. [The Arbitrator] disclosed that he had relationships with counsel for all parties and invited counsel to seek more information if they were concerned, but Nordic's counsel chose not to request further details until only after the Award was entered a year and a half later;
>>
>> 4. Neither [The Arbitrator] nor the GC's counsel even knew about one of the relationships with counsel and absent such knowledge this could not have impacted [The Arbitrator]'s impartiality;
>>
>> 5. There was no factual evidence in the record to support partiality, and no Hawaiʻi state case law supports the retroactive application of the ICA's new presumptive standard;
>>
>> 6. The ICA's creation of a new presumptive standard for evident partiality not only unfairly vacated the well-considered and well-supported Award in the present case, but will also undermine and cast doubt upon countless other pending or completed arbitration awards?
>
> B. Did the ICA err in finding that Nordic had not waived its ability to vacate the Award for alleged evident partiality involving counsel where, before the issuance of the Award:
>
>> 1. Nordic chose not to request any additional information after receiving [The Arbitrator]'s general disclosures about his relationships with all counsel,

24

despite Nordic being invited to do so; and

2. Nordic's counsel failed to demonstrate or state under oath that it did not know or could not have known about the relationship with one of the counsel at the outset of the arbitration, since this information was a matter of public record on Hoʻohiki, and otherwise was available through Nordic's lead counsel's own familial connection with the subject trust entity?

We do not address all of the issues in detail, but provide guidance on remand in the Discussion section below.

LPIHGC first argues that the ICA gravely erred in finding evident partiality based on the mere existence and nondisclosure of specific details about unrelated, allegedly contemporaneous cases and "because it felt that 'it was incumbent upon [the Arbitrator]' to disclose a 'relationship' with Carlsmith due to his role as a QLT trustee." Specifically, LPIHGC argues that the ICA mischaracterized the Arbitrator's relationships with LPIHGC counsel, and ignored (1) the broad, general disclosure that invited further inquiry, (2) Nordic's similar, undisclosed relationships with the Arbitrator, and (3) the Arbitrator's lack of actual knowledge of the QLT's relationship with Carlsmith Ball.

Second, LPIHGC argues that the ICA created a per se rule or presumption of evident partiality that is contrary to legislative intent, which presumes evident partiality only when based on an arbitrator's known, undisclosed relationship with parties. (citing HRS § 658A-12(a)(2)).

Finally, LPIHGC argues that the ICA gravely erred in holding that Nordic did not waive its claim because LPIHGC failed to make a showing that Nordic knew or should have known about the undisclosed circumstances before the Arbitration Award was issued. LPIHGC argues that "[g]iven the policies favoring finality in arbitrations, the party seeking to vacate an Award should be required to prove why it did not know or could not have known before the Award was entered, or else be deemed to have waived the ability to seek vacatur."

### 2. Nordic's Response

In response, Nordic argues that the ICA correctly vacated the award because the Arbitrator failed to disclose multiple, ongoing relationships with LPIHGC's law firms.[14] Nordic argues that the ICA did not apply a per se rule, but rather, applied the standard in HRS § 658A-12(a) and the test for evident partiality to conclude that the "undisclosed relationships were (1) not

_____

14 Although Nordic did not apply for certiorari, it presents questions in its response, as follows:

> 1. Arbitrator's Failure To Disclose Relationships. Are an arbitrator [sic] ongoing fiduciary and financial relationships with the lawyers for one party to an arbitration—including the fact that one of the party's law firms was also the arbitrator's lawyers—"facts that a reasonable person would consider likely to affect the impartiality of the arbitrator" under Haw. Rev. Stat. § 658A-12?

> 2. Inquiry Notice. Does a neutral arbitrator satisfy the statutory duty to disclose by making general statements that omit specific facts regarding ongoing ties, and must the parties assume incomplete disclosure and investigate further, or be deemed to have waived the right to an unbiased decisionmaker?

trivial; (2) ongoing throughout the parties' arbitration; (3) numerous; and (4) the nature of which was the cause for vacatur in another decision" this court cited in Daiichi.  In addition, Nordic contends that the initial disclosure did not sufficiently disclose the relationships to put Nordic on notice of the facts and trigger waiver of the claim.  Nordic therefore argues that it is hardly reasonable to charge it with knowledge of the relationships when LPIHGC lawyers and the Arbitrator claim that they were not aware, and the information was not available until October 2010.

### 3.    LPIHGC's Reply

In reply, LPIHGC argued that (1) the Arbitrator provided the statutorily required disclosures and "no evidence exists that [the Arbitrator] did not disclose what he knew about the relationships with the parties or counsel[;]" (2) a reasonable person would not consider the Arbitrator's role as neutral in other proceedings and as trustee of the QLT to be likely to affect "a well-respected, career Judge and arbitrator['s]" obligation of neutrality; (3) Nordic must "prove evident partiality as a result of the relationship with counsel"; and (4) Nordic's argument that it did not waive its claim is not supported by the facts or law.

## III.  Discussion

This court has yet to address a motion to vacate based on

evident partiality governed by the Uniform Arbitration Act enacted by the Hawaiʻi legislature in 2001, see 2001 Haw. Sess. Laws Act 265, §1 at 810-19, and codified under HRS chapter 658A. In this section, we therefore provide a general framework of legal principles under HRS chapter 658A relevant to Nordic's motion to vacate.  We also address some common law principles that remain relevant to this case.  After general discussion of various legal principles, we analyze them in the context of this case.

### A.    Standard of Review

### 1.    In General

Daiichi's "Standards of Review" section provides as follows:

> **A. Review Of An Arbitration Award**
>
> Where a party challenges an arbitration award, the following precepts are applicable.  First, because of the legislative policy to encourage arbitration and thereby discourage litigation, arbitrators have broad discretion in resolving the dispute.  Upon submission of an issue, the arbitrator has authority to determine the entire question, including the legal construction of terms of a contract or lease, as well as the disputed facts.  In fact, where the parties agree to arbitrate, they thereby assume all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact.
>
> Second, correlatively, judicial review of an arbitration award is confined to the strictest possible limits.  An arbitration award may be vacated only on the four grounds specified in HRS § 658-9 and modified and corrected only on the three grounds specified in HRS § 658-10.  Moreover, the courts have no business weighing the merits of the award.
>
> Third, HRS §§ 658-9 and -10 also restrict the authority of appellate courts to review judgments entered by circuit courts confirming or vacating the arbitration awards.

### B. Findings Of Fact And Conclusions Of Law

We review a trial court's findings of fact under the clearly erroneous standard.

A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.  A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Hawaiʻi appellate courts review conclusions of law de novo, under the right/wrong standard.  Under the right/wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it.

103 Hawaiʻi at 336-37, 82 P.3d at 422-23 (internal citations, ellipses, brackets, and quotation marks omitted).

The promulgation of HRS chapter 658A has not materially changed this standard of review.  Judicial review of arbitration awards remains limited to the statutory grounds for confirmation, vacatur, modification, and correction.  See HRS § 658A-28(a)(3)-(5) (Supp. 2010) (permitting appeal from an order confirming or denying confirmation of an award, an order modifying or correcting an award, or an order vacating an award).

As indicated supra, in reviewing an arbitration award, circuit courts are powerless to correct an arbitrator's findings of fact even if clearly erroneous, or an arbitrator's rulings on the law, even if wrong.  See, e.g., Tatibouet v. Ellsworth, 99 Hawaiʻi 226, 236, 54 P.3d 397, 407 (2002) ("It is well settled that arbitration awards may not be vacated . . . if the

arbitrators commit a legal or factual error in reaching its final decision."); Gadd v. Kelley, 66 Haw. 431, 443, 667 P.2d 251, 259 (1983) ("[E]ven if the arbitrators had erred . . . , the court is powerless to vacate the award as long as the arbitrators' actions did not rise to the level of the grounds specified in HRS § 658-9(4)[.]"); Mars Constructors, Inc. v. Tropical Enters., Ltd., 51 Haw. 332, 336, 460 P.2d 317, 319 (1969) ("[A]ssuming that the arbitrators [] erred in construing the construction contract, a mistake in the application of law and in their findings of fact, this mistake is not one of the three grounds specified in HRS [§] 658-10, and the circuit court correctly ruled that it was powerless to modify or correct the award."); see also Thomas v. Trustees of Lunalilo Estate, 5 Haw. 39, 40 (Terr. 1883) ("[I]t is well settled that the award, if made in good faith, is conclusive upon the parties, and that [they] can[not] be permitted to prove that the arbitrators decided wrong either as to the law or the facts of the case.") (internal quotation marks and citations omitted); Richards v. Ontai, 20 Haw. 198, 201 (Terr. 1910) ("[N]either the circuit court . . . nor this court on appeal can review the findings of fact or the rulings of law made by the arbitrator any further than may be necessary to determine the questions specifically mentioned in the statute[.]").

Appellate review of a motion to vacate, however, does not

involve review of an arbitrator's findings of fact or conclusions of law.  Rather, it involves review of a circuit court's factual findings and conclusions of law as to whether the statutorily outlined grounds for vacatur exist.

In addressing a motion to vacate based on an arbitrator's alleged violation of duties of inquiry and disclosure, the issue of whether a duty exists is a question of law.  See Doe Parents No. 1 v. Dep't of Educ., 100 Hawaiʻi 34, 57, 58 P.3d 545, 568 (2002) ("The existence of a duty . . . is entirely a question of law." (quoting Ruf v. Honolulu Police Dep't, 89 Hawaiʻi 315, 320, 972 P.2d 1081, 1086 (1999)).  The issue of whether a duty has been violated or breached is, however, a question of fact.  See 100 Hawaiʻi at 57-58, 58 P.3d at 568-69 ("Whether there was a breach of duty or not . . . is a question for the trier of fact."); see also Bidar v. Amfac, Inc., 66 Haw. 547, 552, 669 P.2d 154, 159 (1983).  In addition, where material facts are in dispute as to whether a valid waiver exists, the issue of waiver is generally an issue of fact.  Daiichi, 103 Hawaiʻi at 346 n. 17, 82 P.3d at 432 n.17 ("[T]he question [of] whether a valid waiver exists is generally a question of fact[.]").

Thus, in reviewing a circuit court's rulings on a motion to vacate for evident partiality, an appellate court is not reviewing an arbitrator's factual findings and application of

law, which it is powerless to address, but the findings of fact and conclusions of law of the circuit court as to whether a duty of disclosure exists, which is a question of law; whether it has been breached, which is a question of fact; and whether any breach has been waived, which is also a question of fact.  As indicated in Daiichi, issues of law are reviewed de novo but factual issues, if any, are addressed under a "clearly erroneous" standard.

### 2.    Application to This Case[15]

In its Memorandum Opinion, the ICA cited the following as the applicable standard of review:

> We review the circuit court's ruling on an arbitration award de novo," but are also are mindful that the circuit court's review of arbitral awards must be extremely narrow and exceedingly deferential.
>
> Judicial review of an arbitration award is limited by the following precepts:
>
>> First, because of the legislative policy to encourage arbitration and thereby discourage litigation, arbitrators have broad discretion in resolving the dispute. Upon submission of an issue, the arbitrator has authority to determine the entire question, including the legal construction of terms of a contract or lease, as well as the disputed facts.  In fact, where the parties agree to arbitrate, they thereby assume all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact.

---

15    LPIHGC did not specifically allege an incorrect standard of review in its application for certiorari.  It did, however, raise the issue of whether "the ICA err[ed] by creating and retroactively applying a new standard for finding evident partiality . . . where . . . [t]here was no factual evidence in the record to support partiality . . . ."  See supra, Part II.E.1.

32

> Second, correlatively, judicial review of
> an arbitration award is confined to the
> strictest possible limits. An arbitration
> award may be vacated only on the four
> grounds specified in [HRS] § 658-9 and
> modified and corrected only on the three
> grounds specified in HRS § 658-10.
> Moreover, the courts have no business
> weighing the merits of the award.
>
> Third, HRS §§ 658-9 and -10 also restrict the
> authority of appellate courts to review
> judgments entered by circuit courts confirming
> or vacating arbitration awards.

> Kay v.Kaiser Found. Health Plan, Inc., 119 Hawaiʻi 219, 224,
> 194 P.3d 1181, 1186 (App.2008) (internal quotation marks and
> citations omitted) (quoting Schmidt v. Pac. Benefit Servs.,
> Inc., 113 Hawaiʻi 161, 165-66, 150 P.3d 810, 814-15 (2006)).

Nordic, mem. op. at 8.

The ICA cites to Kay for the standard of review. With respect to the first sentence of the ICA's standard of review section, Kay quotes this court's decision in Tatibouet, 99 Hawaiʻi 226, 54 P.3d 397. The referenced citation in Tatibouet repeats the established precept that "[t]he interpretation of a statute is a question of law reviewable de novo." 99 Hawaiʻi at 233, 54 P.3d at 404.

In the instant case, the circuit court denied the motion to vacate without explaining its reasoning or entering findings of fact and conclusions of law. On appeal, the ICA ruled that the Arbitrator's cumulative failure to "disclose his contemporaneous work as neutral in three separate matters for [LPIHGC's] law firms[]" and "that, in the course of his service as a QLT trustee, the QLT was represented by Carlsmith in several

33

litigation matters, including some that were contemporaneous with the arbitration proceeding" sufficiently established a reasonable impression of partiality warranting vacatur of the award. Nordic, mem. op. at 14, 15; accord id. at 18. In so ruling, it is unclear whether the ICA applied the de novo standard referenced in its Memorandum Opinion or whether it concluded that, assuming the circuit court made findings in denying the motion, such findings were clearly erroneous. If the ICA's ruling was based on the applicable clearly erroneous standard, the circuit court did not state the basis of its ruling on the record or enter findings of fact, and therefore there were no factual findings upon which an appellate court could conduct a clearly erroneous review. Material facts were in dispute as to whether the duties of inquiry and disclosure were breached, as well as whether any breach, assuming breach had been established, had been waived.

**B.  Requirement of Evidentiary Hearing on Motion to Vacate When Material Facts are in Dispute**

**1.   In General**

HRS § 658A-5 (Supp. 2010) provides in pertinent part that "an application for judicial relief under this chapter shall be made by motion to the court and heard in the manner provided by law . . . ." With respect to the law, our appellate courts have held that "whenever material facts are in dispute in determining

34

whether an arbitration award should be vacated, the circuit court should conduct an evidentiary hearing and render findings of fact and conclusions of law in support of granting or denying [a] motion to vacate [an] arbitration award." See Clawson, 71 Haw. at 79, 783 P.2d at 1232. In Daiichi, this court reviewed the circuit court's findings of fact and conclusions of law on a motion to vacate. See 103 Hawaiʻi at 349 n.20, 82 P.3d at 435 n.20 (noting that the circuit court's findings of fact were not clearly erroneous, but that its conclusion regarding waiver "was wrong as a matter of law[.]"). In addition to Daiichi, Kay, 119 Hawaiʻi at 222, 194 P.3d at 1184 (holding that "an arbitrator's failure to disclose her direct, personal involvement in ongoing fund-raising solicitations to one of the parties, while the arbitration is pending, creates an impression of partiality or possible bias"), Gadd v. Kelley, 66 Haw. 431, 442, 667 P.2d 251, 259 (1983) (holding that evidence sustained the circuit court's written findings and conclusions in support of confirmation of an arbitration award that "at all times during the proceedings, the members of the arbitration panel acted in a fair and impartial manner[]"), and Brennan v. Stewarts' Pharmacies, Ltd., 59 Haw. 207, 579 P.2d 673 (1978) (affirming the circuit court's conclusions in support of vacating an arbitration award on the bases of evident partiality and exceeding authority), all

involved appellate court review of a circuit court's findings of fact and conclusions of law regarding motions to vacate arbitration awards.

More recently, in <u>Low v. Minichino</u>, 126 Hawaiʻi 99, 267 P.3d 683 (App. 2011), the ICA held that a prospective home purchaser made a prima facie showing that an arbitration award was procured by fraud, warranting an evidentiary hearing on her motion to vacate, and appropriately remanded the case for an evidentiary hearing. 126 Hawaiʻi at 108, 267 P.3d at 692.

### 2. Application to This Case

In this case, neither party requested an evidentiary hearing. The circuit court then denied the motion to vacate without explaining the reasons for its ruling on the record and without entering findings of fact or conclusions of law. Material facts are in dispute, as discussed below; therefore, although not requested by the parties, the circuit court should have conducted an evidentiary hearing and rendered findings of fact and conclusions of law. In addition to issues of fact regarding evident partiality that have been the focus of this appeal, the circuit court did not address whether there are disputes of material fact regarding fraud and exceeding authority, additional bases on which Nordic moved to vacate the Arbitration Award. If there are, the circuit court must also determine those issues on remand.

36

We now turn to issues that may arise during the evidentiary hearing on remand.

## C.   Disclosure Requirements Under HRS § 658A-12(a) and (b)

### 1.   In General

As noted in Daiichi at footnote 5, 103 Hawaiʻi at 330 n.5, 22 P.3d at 416 n.5, "[t]he former HRS chapter 658 contained no express provision relating to an arbitrator's duty to disclose."[16]  HRS § 658A-12 now specifically provides, in pertinent part:

> **§658A-12 Disclosure by arbitrator.** (a)  Before accepting appointment, an individual who is requested to serve as an arbitrator, after making a reasonable inquiry, shall disclose to all parties to the agreement to arbitrate and arbitration proceeding and to any other arbitrators any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding, including:
>
> > (1)  A financial or personal interest in the outcome of the arbitration proceeding; and
> >
> > (2)  An existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or representatives, a witness, or another arbitrator.
>
> (b)  An arbitrator has a continuing obligation to disclose to all parties to the agreement to arbitrate and arbitration proceeding and to any other arbitrators any facts that the arbitrator learns after accepting appointment which a reasonable person would consider likely to affect the impartiality of the arbitrator.
>
>  . . . .

HRS § 658A-12(a)-(b) (emphasis added).

Therefore, under HRS § 658A-12(a), an arbitrator must make a

---

16   In Daiichi, a non-neutral arbitrator acted in a manner that did not portray his close personal, professional, and financial relationships with a party and its counsel.  See generally 103 Hawaiʻi at 329-31, 82 P.3d at 415-17.

reasonable inquiry before accepting appointment.  The Commentary

to the Uniform Arbitration Act (UAA) (2001) (hereinafter

"Commentary"), drafted by the National Conference of

Commissioners on Uniform State Laws, states as follows:

> Section 12(a) requires an arbitrator to make a "reasonable inquiry" prior to accepting an appointment as to any potential conflict of interests. The extent of this inquiry may depend upon the circumstances of the situation and the custom in a particular industry. For instance, an attorney in a law firm may be required to check with other attorneys in the firm to determine if acceptance of an appointment as an arbitrator would result in a conflict of interest on the part of that attorney because of representation by an attorney in the same law firm of one of the parties in another matter.

Nat'l Conference of Comm'rs on Unif. State Laws, Uniform

Arbitration Act (Last Revisions Completed Year 2000), 48 (Dec.

13, 2000),

http://www.uniformlaws.org/shared/docs/arbitration/arbitration_fi

nal_00.pdf (emphasis added).

     According to the Commentary, what constitutes a reasonable

inquiry varies depending on the circumstances, and whether the

duty of reasonable inquiry has been violated is a question of

fact.  After making a reasonable inquiry, the arbitrator must

then disclose information that a reasonable person would consider

likely to affect impartiality.  The Commentary further provides:

> Once an arbitrator has made a "reasonable inquiry" as required by Section 12(a), the arbitrator will be required to disclose only "known facts" that might affect impartiality. The term "knowledge" (which is intended to include "known") is defined in Section 1(4) to mean "actual

38

knowledge."[17]

Commentary, supra, at 48.  The arbitrator also has a continuing

obligation to disclose such facts a reasonable person would

consider likely to affect impartiality after appointment under

HRS § 658A-12(b).[18]

HRS § 658A-12 is a culmination of case law developed from

the seminal United States Supreme Court case of Commonwealth

Coatings Corp. v. Continental Casualty Co., 393 U.S. 145 (1968),

which we cited in Daiichi.  See 103 Hawaiʻi at 340-41, 82 P.3d at

426-27.  In Commonwealth, the United States Supreme Court

addressed the circumstances under which the United States

Arbitration Act § 10, 9 U.S.C. § 10(b),[19] authorizes vacatur of

---

17    It is possible that an arbitrator would not discover facts a
reasonable person would find likely to affect impartiality despite making a
"reasonable inquiry."

18    We note that the diminished standard of disclosure allowed by this
court in Daiichi for non-neutral arbitrators no longer applies due to the
affirmative duty of disclosure in HRS § 658A-12.  See 103 Hawaiʻi at 349-50,
82 P.3d at 435-36 (Acoba, J., dissenting) (disagreeing with the majority that
non-neutral arbitrators are subject to a different standard of disclosure that
permits them to provide a broad, general disclosure, and opining that an award
should be set aside when the disclosure is misleading and inadequate).

19    At the relevant time, 9 U.S.C. § 10(b) provided, in pertinent
part:

> In either of the following cases the United States court in
> and for the district wherein the award was made may make an
> order vacating the award upon the application of any party
> to the arbitration--
>
>  . . .
>
> (b) Where there was evident partiality or corruption in the
> arbitrators, or either of them. . . .

See Commonwealth, 393 U.S. at 147 n.1 (internal quotation marks omitted).

an arbitration award for failure to disclose the existence of a close financial relationship between a neutral arbitrator and a party to the arbitration.  393 U.S. at 146–48.  The neutral member of a three-arbitrator panel failed to disclose his engagement in periodic and significant business relations with one of the parties to the arbitration for approximately six years before the arbitration.  393 U.S. at 146.  The United States Supreme Court reversed the decision of the United States Court of Appeals for the First Circuit, which had affirmed the district court's refusal to set aside the arbitration award.  393 U.S. at 150.

The Commentary discusses Commonwealth as follows:

> Members of the Court differed, however, on the standards for disclosure. Justice Black, writing for a four-judge plurality, concluded that disclosure of "any dealings that might create an impression of possible bias" or creating "even an appearance of bias" would amount to evident partiality. Id. at 149. Justice White, in a concurrence joined by Justice Marshall, supported a more limited test which would require disclosure of "a substantial interest in a firm which has done more than trivial business with a party." Id. at 150. Three dissenting justices favored an approach under which an arbitrator's failure to disclose certain relationships established a rebuttable presumption of partiality.
>
> The split of opinion in Commonwealth Coatings is reflected in many subsequent decisions addressing motions to vacate awards on grounds of "evident partiality" under federal and state law. A number of decisions have applied tests akin to Justice Black's "appearance of bias" test. See, e.g., S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1263 (2d Cir. 1973) (applying FAA; failure to disclose relationships that "might create an impression of possible bias"). Some courts have introduced an objective element into the standard – that is, viewing the facts from the standpoint of a reasonable person apprised of all the circumstances. See, e.g., Ceriale v. AMCO Ins. Co., 48 Cal. App.4th 500, 55 Cal. Rptr. 2d 685 (1996)(finding that question is whether record reveals facts

> which might create an impression of possible bias in eyes of hypothetical, reasonable person).
>
> A greater number of other courts, mindful of the tradeoff between impartiality and expertise inherent in arbitration, have placed a higher burden on those seeking to vacate awards on grounds of arbitrator interests or relationships. See, e.g., Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681 (7th Cir. 1983), cert. denied, 464 U.S. 1009, 104 S. Ct. 529, 78 L. Ed.2d 711, modified, 728 F.2d 943 (7th Cir. 1984) (applying FAA; circumstances must be "powerfully suggestive of bias"); Artists & Craftsmen Builders, Ltd. v. Schapiro, 232 A.D.2d 265, 648 N.Y.S.2d 550 (1996) (stating that though award may be overturned on proof of appearance of bias or partiality, party seeking to vacate has heavy burden and must show prejudice).

Commentary, supra, at 46-47.

As noted by the Commentary, there was no majority in Commonwealth regarding standards for disclosure, and subsequent case law has varied on disclosure requirements. The former HRS chapter 658 also contained no disclosure requirement, and the common law tension noted in the Commentary is similarly reflected in Hawaiʻi cases on disclosure standards, as evidenced by the conflicting disclosure standards argued by Nordic and LPIHGC throughout this litigation.

Regardless of any confusion that may have existed, the Hawaiʻi legislature adopted Section 12 of the UAA in its entirety. Compare HRS § 658A-12 with Commentary, supra, at 44-45 (UAA section 12 is identical to HRS § 658A-12). Thus, arbitrators in arbitrations governed by HRS chapter 658A are now required to follow the disclosure requirements of HRS § 658A-12(a). In this regard, according to the Commentary to UAA Section 12(a):

> 2. In view of the critical importance of arbitrator disclosure to party choice and perceptions of fairness and the need for more consistent standards to ensure expectations in this vital area, Section 12 sets forth affirmative requirements to assure that parties should [have] access to all information that might reasonably affect the potential arbitrator's neutrality. Section 12 is the AAA/ABA Code of Ethics for Arbitrators in Commercial Disputes (1977), which embodies the principle that "arbitrators should disclose the existence of any interests or relationships which are likely to affect their impartiality or which might reasonably create the appearance of partiality or bias." . . .

> The Drafting Committee decided to delete the requirement of disclosing "any" financial or personal interest in the outcome or "any" existing or past relationship and substituted the terms "a" financial or personal interest in the outcome or "an" existing or past relationship. The intent was not to include *de minimis* interests or relationships. For example, if an arbitrator owned a mutual fund which as part of a large portfolio of investments held some shares of stock in a corporation involved as a party in an arbitration, it might not be reasonable to expect the arbitrator to know of such investment and in any event the investment might be of such an insubstantial nature so as not to reasonably affect the impartiality of the arbitrator.

> 3. The fundamental standard of Section 12(a) is an objective one: disclosure is required of facts that a reasonable person would consider likely to affect the arbitrator's impartiality in the arbitration proceeding.

Commentary, supra, at 47-48.

Thus, pursuant to HRS § 658A-12(a), although disclosure of de mininis interests or relationships is not required, arbitrators must at the outset disclose, then continually disclose throughout the course of an arbitration proceeding, any known facts that a reasonable person would consider likely to affect the arbitrator's impartiality.

With respect to the duty of disclosure, we also address several subissues of law.

42

### a. "Counsel" Under HRS § 658A-12(a)(2) Does Not Include All Attorneys in a Law Firm

The ICA's ruling vacating the Arbitration Award cited to HRS § 658A-12(a)(2), which requires disclosure of relationships with a party's "counsel." Nordic, mem. op. at 9. The ICA construed "counsel" under HRS § 658A-12(a)(2) to include all attorneys within the law firms of attorneys representing parties to the arbitration.

In doing so, the ICA relied heavily on VMI, 105 F. Supp. 2d 1118. Nordic, mem. op. at 11-13. VMI held that an arbitrator demonstrated a "reasonable impression of partiality" where he engaged in undisclosed ex parte discussions with VMI's attorney that led to his role as a mediator in an unrelated matter involving that attorney during the pendency of the arbitration. 105 F. Supp. 2d at 1120. Although the federal district court stated that it was "convinced that . . . both VMI's counsel and the Arbitrator were acting in good faith[,] . . . the nondisclosure of the discussion and appointment . . . was clearly a serious failing that warrants vacating the Arbitration Award." 105 F. Supp. 2d at 1123-24. Although VMI was decided under HRS chapter 658, which contained no specific disclosure requirements, if decided now, the arbitrator's nondisclosure of ex parte communications with a party's attorney regarding his retention as a mediator in another case would clearly trigger HRS § 658A-

43

12(a)(2), which requires disclosure of "relationship[s] with any of the parties to the agreement . . . [and] their counsel . . . [,]" as well as the continuing obligation of disclosure under HRS § 658A-12(b).

The issue of law in this case, however, is whether "counsel" under HRS § 658A-12(a)(2) includes all attorneys in a law firm representing a party to the arbitration. For the reasons below, we hold it does not.

No definition of "counsel" is provided in HRS chapter 658A. Black's Law Dictionary, however, defines "counsel," inter alia, as "[o]ne or more lawyers who represent a client[.]" See Black's Law Dictionary 401 (9th ed. 2009). Thus, "counsel" under HRS § 658A-12(a)(2) means the attorney representing the party. In addition, the Commentary to UAA Section 12 distinguishes its use of the terms, "attorney," "law firm," and "counsel, and includes the phrase "[i]f the parties are represented by counsel or other authorized persons, the arbitrators can make such representations to those individuals." Commentary, supra, at 49 (emphasis added). Thus, "counsel" in this context does not mean all attorneys in a law firm.

Moreover, construing "counsel" to include all attorneys within a law firm would contravene "the effectiveness of arbitration as a vehicle for the resolution of disputes[,]" which

"depends in part upon the predictability of its efficiency." Daiichi, 103 Hawaiʻi at 339, 82 P.3d at 425. Many law firms now have multiple offices throughout the United States and also worldwide, with over 1000 attorneys. Defining "counsel" to include all attorneys in a law firm would require arbitrators to ascertain and review the names of all attorneys of a law firm, and would most likely result in excessive preemptive disclosures of relationships with attorneys in the firm. The continuing duty of disclosure would also require an arbitrator to keep up with attorneys entering or leaving such law firms in order to satisfy the continuing duty of disclosure.

Thus, as a matter of law, "counsel" under HRS § 658A-12 does not include all attorneys in the law firm of an attorney representing a party to an arbitration.

> **b.** **Pursuant to HRS § 658A-12(a), an Arbitrator Must Still Disclose Any Relationships that a Reasonable Person Would Consider Likely to Affect the Arbitrator's Impartiality**

Although "counsel" refers only to the attorneys representing parties to an arbitration and not all attorneys in their firms, HRS § 658A-12(a) requires that an arbitrator disclose facts that a reasonable person would consider likely to affect the arbitrator's impartiality. Depending on the circumstances, such facts could include an arbitrator's relationships with other attorneys within a law firm of counsel representing a party to

45

the arbitration. As the ICA stated in <u>Kay</u>, an "arbitrator's failure to disclose to the parties <u>any</u> dealings that might create 'an impression of possible bias' is sufficient to support vacatur." 119 Hawaiʻi at 226, 194 P.3d at 1188 (emphasis added) (citations omitted).

In this regard, the Texas Supreme Court held "that a neutral arbitrator selected by the parties or their representatives exhibits evident partiality . . . if the arbitrator does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality." <u>Burlington Northern R. Co. v. TUCO Inc.</u>, 960 S.W.2d 629, 630 (Tex. 1997). In that case, a neutral arbitrator sitting on a panel of three failed to disclose his acceptance, during the course of the arbitration, of a substantial referral from the law firm of a non-neutral co-arbitrator appointed by one of the parties to the arbitration. 960 S.W.2d at 630. The neutral arbitrator had disclosed that the co-arbitrator's law firm had twice retained him as an expert witness in relatively small matters that had concluded, but continued serving on the panel without disclosing the subsequent substantial referral. 960 S.W.2d at 630-31.[20]

---

[20] The trial court had denied the motion to vacate. 960 S.W.2d at 632. The court of appeals concluded that a factual issue regarding evident partiality existed, and remanded for a trial on that issue. <u>Id.</u> The Texas

(continued...)

Even though the co-arbitrator whose firm referred the matter to the arbitrator did not know about the referral and had no involvement in procuring it, and despite the argument that the relationship was "too indirect" because the law firm was neither a party to the arbitration nor counsel for a party, the Texas Supreme Court held "that a party who could have vetoed the arbitrator at the time of selection may disqualify the arbitrator during the course of the proceedings based on a new conflict which might reasonably affect the arbitrator's impartiality." 960 S.W.2d at 637. In reaching this holding, the court explained that "[a]n objective observer could still reasonably believe that a person in [the arbitrator's] position, grateful for the referral, may have been inclined to favor [the law firm] as an entity (and thus [the party it represented] indirectly) in the arbitration proceedings by siding with [the co-arbitrator whose firm referred him]." Id. (noting that the arbitrator was moved to thank the co-arbitrator for the referral in the midst of the arbitration proceeding). The majority in Burlington further opined that "the fact that a reasonable person could conclude that the referral might affect [the arbitrator's] impartiality

---

20(...continued)
Supreme Court found evident partiality, effectively acting as factfinder, a procedure we decline to adopt. 960 S.W.2d at 639. In addition, although Burlington is factually distinguishable, we refer to it to outline possible facts to consider.

triggers the duty of disclosure[]" such that his failure to disclose the referral constitutes evident partiality. 960 S.W.2d at 639 (The court also "fully recognize[d] that reasonable people could debate whether the referral was likely to affect [the arbitrator's] impartiality.").

### 2. Application to This Case

#### a. The Arbitrator's Retention as a Neutral By Attorneys of Law Firms Representing LPIHGC

The Arbitrator knew of his retention as a neutral by attorneys of law firms representing LPIHGC. Applying the law outlined above, on remand, the circuit court must address whether a reasonable person would view the three referrals for contemporaneous work as neutral by members of LPIHGC's law firms likely to affect the Arbitrator's impartiality. If so, the Arbitrator had a duty to disclose this information.

#### b. Carlsmith Ball's Representation of the Arbitrator as Trustee of QLT

LPIHGC asserts that the Arbitrator did not know of Carlsmith Ball's representation of him in his capacity as trustee of the QLT. In order to satisfy the duty of disclosure, however, HRS § 658A-12(a) requires that an arbitrator "mak[e] a reasonable inquiry." Thus, if the circuit court finds that this relationship is of the nature that a reasonable person would consider likely to affect the Arbitrator's impartiality, the Arbitrator had a duty of reasonable inquiry to ascertain and

48

disclose the information.  In this case, there is no question that such information would have become "known" had an inquiry been made, as evidenced by the Arbitrator's subsequent disclosure.

With respect to whether there was a duty of disclosure, the ICA stated that "it was incumbent upon [the Arbitrator] to disclose this relationship with Carlsmith" because "[o]nly then could Nordic have evaluated whether Carlsmith's representation of the QLT would affect Nordic's decision on whether to select [the Arbitrator] . . . or sought further information . . . ."  Nordic, mem. op. at 15 (citing Schmitz v. Zilveti, 20 F.3d 1043, 1047 (9th Cir. 1994) ("The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed.")).  Haitsuka, the Carlsmith Ball attorney who directly handled the QLT matters, declared that he never communicated with the Arbitrator on any trustee issues or anything related to the arbitration, and had only spoken to the QLT's executive officers and managers.  He also stated that Carlsmith Ball has not represented the Arbitrator in his individual capacity.  In addition, since 2002, the QLT apparently retained at least thirty-one law firms or attorneys, including Carlsmith Ball, and Carlsmith Ball apparently also represented parties with interests adverse to the QLT.

49

Nordic raises questions, however, regarding the extent of the Arbitrator's role and involvement in the QLT-Carlsmith litigation matters.[21]  In general, a trustee does not have any personal financial gain from trust litigation and has no personal liability when sued as a trustee.[22]  Nordic asserts, however, that in determining whether an impression of partiality exists, a reasonable person might also consider the impact of a law firm's representation of the trust in assuring continuation of the Arbitrator's compensation as trustee.  See Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp., 751 A.2d 426, 432-33 (Del. Ch.

---

21      For example, Nordic cites to Hawaiʻi Probate Rule 42(a) as the type of information it might have considered in its evaluation, which provides:

> An attorney employed by a fiduciary for an estate, guardianship, or trust represents the fiduciary as client as defined in Rule 503(a) of the Hawaiʻi Rules of Evidence and shall have all the rights, privileges, and obligations of the attorney-client relationship with the fiduciary insofar as the fiduciary is acting in a fiduciary role for the benefit of one or more beneficiaries or a ward.

22      Restatement (Third) of Trusts § 106 (2012) provides:

> A trustee is personally liable:
>
>> (1) on a contract entered into in the course of trust administration only if:
>>
>>> (a) in so doing, the trustee committed a breach of trust; or
>>>
>>> (b) the trustee's representative capacity was undisclosed and unknown to the third party; or
>>>
>>> (c) the contract so provides;
>>
>> (2) for a tort committed in the course of trust administration, or for an obligation arising from the trustee's ownership or control of trust property, only if the trustee is personally at fault.

1999) (holding that an arbitrator's failure to disclose that the same attorneys who were representing the arbitrator in unrelated litigation, which "he had over $100,000 riding on," were also representing a party to the arbitration "is, in itself, sufficient to constitute evident partiality").[23]

The Arbitrator had a duty to disclose Carlsmith Ball's representation of him as a QLT trustee if a reasonable person would consider the actual relationship between the Arbitrator and Carlsmith Ball likely to affect his impartiality. In other words, it is possible that facts discovered after an inquiry would not trigger the duty of disclosure, if a reasonable person would not consider such facts likely to affect an arbitrator's impartiality. Thus, upon remand, the circuit court must determine whether the Arbitrator's duty of reasonable inquiry included a duty to ascertain the identities of attorneys and/or law firms representing the QLT. If so, the circuit court must also determine whether a reasonable person would consider the actual relationship between the Arbitrator and Carlsmith Ball likely to affect his impartiality such that the Arbitrator violated his duty of disclosure by not disclosing Carlsmith Ball's representation of him as trustee.

---

23    There is no admissible evidence to substantiate Nordic's allegation that the Arbitrator receives a six figure annual compensation as trustee of the QLT trust.

## D.  Effect of an Arbitrator's Failure to Disclose

### 1.  In General

If an arbitrator fails to disclose facts that a reasonable person would consider likely to affect his impartiality, pursuant to HRS § 658A-12(d), "upon timely objection by a party, the court under section 658A-23(a)(2) may vacate an award."[24]

HRS § 658A-23 provides in relevant part as follows:

> (a)  Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:
>     (1)  The award was procured by corruption, fraud, or other undue means;
>     (2)  There was:
>         (A)  Evident partiality by an arbitrator appointed as a neutral arbitrator;
>         (B) Corruption by an arbitrator; or
>         (C) Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding
>     . . .
>     (4)  An arbitrator exceeded the arbitrator's powers;
>     . . . .

As noted in <u>Daiichi</u>, HRS § 658A-23(a)(2)(A) now limits the ground for vacating an award on the basis of "evident partiality" to the "arbitrator appointed as a neutral arbitrator."  103 Hawaiʻi at 339, 82 P.3d at 425.

At first glance, it may seem that after a determination that an arbitrator failed to disclose a fact a reasonable person would consider likely to affect his impartiality, there must also be a separate finding that the arbitrator acted with "evident

---

24    The issue of whether "may" actually gives the circuit court discretion to deny vacatur after finding evident partiality is addressed in Part III.F, below.

partiality" or bias before an award can be vacated.  As explained below, however, a failure to meet disclosure requirements under HRS § 658A-12(a) or (b) is equivalent to, or constitutes, "evident partiality" as a matter of law.

The Commentary to UAA Section 23 merely states that "Section 23(a)(2) is based on UAA Section 12(a)(2).  The reason 'evident partiality' is a grounds for vacatur only for a neutral arbitrator is because non-neutral arbitrators, unless otherwise agreed, serve as representatives of the parties appointing them." Commentary, supra, at 79.  The Commentary's discussion of what constitutes "evident partiality" occurs entirely in the comments regarding disclosure requirements under Section 12(a).  As reflected in the Commentary, quoted above in Part III.C.1, the differing views on the standards of disclosure parallel the differing views on what constitutes "evident partiality."

This correlation between the standards of disclosure and "evident partiality" is also reflected in our case law.  As this court stated in Daiichi:

> Insofar as section 10(b) of the Federal Arbitration Act (9 U.S.C. § 1 et seq.) is the federal counterpart of HRS § 658-9(2), this jurisdiction's appellate courts have consistently relied on federal case law in ascertaining what constitutes "evident partiality" under HRS § 658-9(2).
>
> What constitutes "evident partiality" sufficient to vacate an arbitration award is a difficult question.  Under Hawaiʻi law, "evident partiality" sufficient to vacate an arbitration award may be demonstrated when a conflict of interest exists with the arbitrator. That is, when an arbitrator has a personal, professional, or business relationship with a party, its counsel,

53

> principal, or agent, a conflict of interest may arise sufficient to justify vacating that arbitration award. <u>Hawaiʻi courts have explained that evident partiality not only exists when there is actual bias on the part of the arbitrator, but also when undisclosed facts demonstrate a "reasonable impression of partiality</u>."

103 Hawaiʻi at 339-40, 82 P.3d at 425-26 (quoting <u>VMI</u>, 105 F. Supp. 2d at 1124) (emphasis added) (internal citations omitted).

HRS § 658A-12 has explicitly adopted a requirement to disclose facts a reasonable person would find likely to affect an arbitrator's impartiality.  Pursuant to <u>Daiichi</u>, "evident partiality" exists not only when there is actual bias on the part of an arbitrator, "but also when undisclosed facts demonstrate a reasonable impression of partiality."  103 Hawaiʻi at 340, 82 P.3d at 426 (internal quotation marks and citations omitted).  Therefore, a failure to disclose facts a reasonable person would consider likely to affect the arbitrator's impartiality constitutes "evident partiality" under HRS § 658A-23(a)(2).

We also point out a few additional sections within HRS chapter 658A that may become relevant in the circuit court's evidentiary hearing on remand.  First, "[t]he burden of proving facts which would establish a reasonable impression of partiality rests squarely on the party challenging the award."  103 Hawaiʻi at 339, 82 P.3d at 425 (quoting <u>Sheet Metal Workers Int'l Ass'n Local Union 420 v. Kinney Air Conditioning Co.</u>, 756 F.2d 742, 745 (9th Cir. 1985)).  Also, HRS § 658A-12(e) provides, in relevant

part:

> An arbitrator appointed as a neutral arbitrator who does not disclose a known, direct, and material interest in the outcome of the arbitration proceeding or a known, existing, and substantial relationship with a party is presumed to act with evident partiality under section 658A-23(a)(2).

Finally, HRS § 658A-14(d)(2) (Supp. 2010) provides, in pertinent part:

> In a judicial, administrative, or similar proceeding, an arbitrator or representative of an arbitration organization is not competent to testify, and shall not be required to produce records as to any statement, conduct, decision, or ruling occurring during the arbitration proceeding, to the same extent as a judge of a court of this State acting in a judicial capacity.  This subsection does not apply:
>
> . . .
>
> (2)  To a hearing on a motion to vacate an award under section 658A-23(a)(1) or (2) if the movant establishes prima facie that a ground for vacating the award exists.

Thus, an arbitrator can be called to testify at an evidentiary hearing only if a party establishes prima facie that a ground for vacatur exists.

### 2.    Application to This Case

LPIHGC repeatedly cites to the following excerpt from Daiichi:

> [t]he mere fact of a prior relationship is not in and of itself sufficient to disqualify arbitrators. The relationship between the arbitrator and the party's principal must be so intimate—personally, socially, professionally, or financially—as to cast serious doubt on the arbitrator's impartiality. If all arbitrators' relationships came into question, finding qualified arbitrators would be a difficult, sometimes impossible, task.

(quoting 103 Hawaiʻi at 342, 82 P.3d at 428 (alteration in original) (quoting Washburn, 895 F. Supp. at 399)).

This principle is, however, inapplicable to this case as Daiichi addressed non-neutral arbitrators under a statutory scheme that contained no explicit disclosure requirements. Although non-neutral arbitrators are now held to the same standard of disclosure as neutral arbitrators, vacatur for evident partiality under HRS § 658A-23(a)(2)(C) applies only when a neutral arbitrator fails to make the required disclosures.[25]

Thus, upon remand, Nordic bears the burden of proving evident partiality, i.e., the failure to disclose facts that a reasonable person would consider likely to have affected the Arbitrator's impartiality.

We note that LPIHGC's assertion that the ICA improperly applied the presumption under HRS § 658A-12(e) in vacating the award lacks merit. Contrary to LIPHGC's assertion, the ICA's Memorandum Opinion expressly states that "[t]his presumption . . . does not apply where the failure to make required disclosures concerns the arbitrator's relationship to a party's counsel." Nordic, mem. op. at 10 n.4 (citing HRS §§ 658A-12(d), 658A23(a)(2)(A)).

---

25    According to the Commentary to UAA Section 12, "[a] party-appointed, non-neutral arbitrator's failure to disclose would be covered under the corruption and misconduct provisions of Section 23(a)(2) because in most cases it is presumed that a party arbitrator is intended to be partial to the side which appointed that person." Commentary, supra, at 49.

### E.    Timeliness and Waiver of Objections

#### 1.    In General

As noted earlier, HRS § 658A-12(d) provides "[i]f the arbitrator did not disclose a fact as required by subsection (a) or (b), upon timely objection by a party, the court under section 658A-23(a)(2) may vacate an award."  In addition, a party who has actual or constructive knowledge of a relationship of the arbitrator requiring disclosure but "fails to raise a claim of partiality . . . prior to or during the arbitration proceeding is deemed to have waived the right to challenge the decision based on 'evident partiality.'"  Daiichi, 103 Hawaiʻi at 345-46, 82 P.3d at 431-32 ("In the arbitration context, waiver has been defined as consisting of knowledge, actual or constructive, in the complaining party of the tainted relationship or interest of the arbitrator and the failure to act on that knowledge.") (internal quotation marks and citations omitted).

As noted in Daiichi at footnote 17, "the question [of] whether a valid waiver exists is generally a question of fact, [however] 'when the facts are undisputed it may become a question of law.'" 103 Hawaiʻi at 346 n.17, 82 P.3d at 432 n.17 (quoting Hawaiian Homes Comm'n v. Bush, 43 Haw. 281, 286 (Terr. 1959)).

#### 2.    Application to This Case

To determine whether the initial disclosure put the parties

on notice of the relationships, the ICA analyzed the Arbitrator's use of the present perfect tense in his disclosure, in which he stated, "[s]ince retirement, I have served as a neutral for counsel and members of their law firms[,]" and found that it referred only to "engagements completed in the past." Nordic, mem. op. at 17. The ICA also found the following:

> [W]hile [the Arbitrator's] initial disclosure provided some notice of his role as a neutral arbitrator in cases involving the parties' counsel, it failed to make any reference, or provide any notice, of his role as a trustee of the QLT and Carlsmith Ball's representation of the QLT. Thus, unlike the issue of [the Arbitrator's] work as an arbitrator in unrelated arbitrations involving the Carlsmith Ball and Starn O'Toole firms, the issue of [the Arbitrator's] role as a trustee of the QLT and Carlsmith Ball's representation of the QLT was not raised at all in [the Arbitrator's] initial disclosure.

LPIHGC argued, however, that the Arbitrator's initial disclosure ("Since retirement, I have served as a neutral . . . .") "is in present-perfect tense[]" and "denotes that the Arbitrator's work as a neutral began in the past, continued thereafter, and may still be continuing." (emphasis omitted). The ICA concluded that "[t]o the extent that there is no showing that Nordic was aware of [the Arbitrator's] contemporaneous work as a neutral with Carlsmith Ball and Starn O'Toole prior to issuance of the Award, Nordic has not waived its right to claim evident partiality." Nordic, mem. op. at 17. The meaning of the initial disclosure is a disputed question of fact that can be addressed by the circuit court on remand if appropriate.

In addition, this court has recognized that "[a] respectable

number of federal jurisdictions have invoked the waiver principle under circumstances in which the complaining party knew or should have known of the potential partiality of an arbitrator but failed to raise an objection to the arbitrator's appointment prior to the arbitration decision."  103 Hawaiʻi at 346, 82 P.3d at 432 (citing cases from the 1st, 2nd, 3rd, and 8th circuits).  In addition, courts do not endorse the "wait and see approach."  103 Hawaiʻi at 348, 82 P.3d at 434 (citing Hobet Mining, Inc. v. Int'l Union, United Mine Workers of Am., 877 F. Supp. 1011, 1019 (S.D.W.Va. 1994) ("[W]here information about an arbitrator is not known in advance, but could have been ascertained by more thorough inquiry or investigation, a post-award challenge suggests that nondisclosure is being raised merely as a 'tactical response to having lost the arbitration' or an inappropriate attempt to seek a 'second bite at the apple' because of dissatisfaction with the outcome.") (citations omitted)).

Nordic never responded to LPIHGC's questions regarding when its representatives or its attorneys discovered Carlsmith Ball's representation of the Arbitrator as trustee of the QLT.  Notably, only Oshiro's declaration asserting lack of knowledge was submitted with Nordic's motion to vacate; declarations were not submitted by Nordic's other counsel in the arbitration hearings.

Due to the lack of an evidentiary hearing, there are no

59

findings regarding the actual or constructive knowledge of Nordic's representatives or counsel, including when Nordic's representatives or other counsel actually discovered the Arbitrator's position as a trustee of the QLT, and Carlsmith Ball's representation of him in that capacity, assuming the Arbitrator's duty of reasonable inquiry required disclosure of such facts, as discussed previously.  There are also no findings as to when Nordic or its other attorneys learned of the Arbitrator's additional retention as a neutral by other attorneys in LPIHGC's counsel's law firms.  Therefore, on remand, if necessary, the circuit court can determine the sufficiency of the initial disclosure, Nordic's actual or constructive knowledge, and the timeliness of Nordic's objection to determine whether Nordic waived its right to claim evident partiality.

### F.    Circuit Court Discretion Under HRS § 658A-12(d)

#### 1.    In General

Finally, HRS § 658A-12(d) provides that "(i)f the arbitrator did not disclose a fact as required by subsection (a) or (b), upon timely objection by a party, the court under section 658A-23(a)(2) <u>may</u> vacate an award."  As noted by the Commentary to UAA Section 12(d), "[c]ourts also are given wider latitude in deciding whether to vacate an award under Section 12(c)[26] and

---

26    HRS § 658A-12(c) provides:

(continued...)

(d) that is permissive in nature (an award "may" be vacated) rather than Section 23(a) which is mandatory (a court "shall" vacate an award)." Commentary, supra, at 50.

### 2. Application to This Case

Nordic brought its motion to vacate under HRS § 658A-23(a), citing its mandatory "shall vacate an award" language. If the circuit court reaches this point of the analysis on remand, it has discretion under HRS § 658A-12(d) to decide whether or not to grant the motion to vacate. Any such ruling of the circuit court under HRS 658A-12(d) will be reviewed under an abuse of discretion standard.

## IV. Conclusion

This court stated in Daiichi:

> It is generally considered that parties resort to arbitration to settle disputes more expeditiously and inexpensively than by a court action; and also that the objective is to have disputes considered by arbitrators, who are familiar with the problem, in a less formal and combative environment. Thus, it must be deemed that the primary purpose of arbitration is to avoid litigation.

103 Hawaiʻi at 339, 82 P.3d at 425 (quoting Mars Constructors, Inc., 51 Haw. at 334, 460 P.2d at 318-19).

As further noted in Daiichi,

> The arbitration process functions best when an amicable and

---

26(...continued)
If an arbitrator discloses a fact required by subsection (a) or (b) to be disclosed and a party timely objects to the appointment or continued service of the arbitrator based upon the fact disclosed, the objection may be a ground under section 658A-23(a)(2) for vacating an award made by the arbitrator.

> trusting atmosphere is preserved and there is voluntary
> compliance with the decree, without need for judicial
> enforcement.  This end is best served by establishing an
> atmosphere of frankness at the outset, through disclosure by
> the arbitrator of any financial transactions which he has
> had or is negotiating with either of the parties.  In many
> cases the arbitrator might believe the business relationship
> to be so insubstantial that to make a point of revealing it
> would suggest he is indeed easily swayed, and perhaps a
> partisan of that party.  But if the law requires the
> disclosure, no such imputation can arise. And it is far
> better that the relationship be disclosed at the outset,
> when the parties are free to reject the arbitrator or accept
> him with knowledge of the relationship and continuing faith
> in his objectivity, than to have the relationship come to
> light after the arbitration, when a suspicious or
> disgruntled party can seize on it as a pretext for
> invalidating the award.

103 Hawaiʻi at 341, 82 P.3d at 427 (quoting Commonwealth

Coatings, 393 U.S. at 150-52 (White, J., concurring)).

HRS chapter 658A now imposes clear standards for disclosure.

Prompt and continuous disclosures, whether or not required, will

better serve the efficiency goals of arbitration by helping to

avoid motions to vacate and lengthy judicial review, as in this

case.

In the instant case, however, it is for the circuit court as

factfinder, not an appellate court, to determine whether

reasonable inquiry and disclosure standards were met, and if not,

whether the Arbitration Award should be vacated for this or any

other reason alleged.  Although entry of findings of fact and

conclusions of law are not required on all motions to vacate as

long as the circuit court's reasoning is clearly stated on the

record, due to the numerous issues in this case, to allow

appropriate appellate review, the circuit court is to conduct an

evidentiary hearing and render findings of fact and conclusions of law.

Accordingly, we vacate the ICA's Judgment on Appeal, and the circuit court's March 24, 2011 Final Judgment, thereby vacating the associated orders (1) granting LPIHGC's motion to confirm the Arbitration Award, and (2) denying Nordic's motion to vacate the Arbitration Award, and remand this case to the circuit court for further proceedings consistent with this opinion.

Terence J. O'Toole,                   /s/ Paula A. Nakayama
Judith Ann Pavey, and
John P. Manaut                        /s/ Sabrina S. McKenna
for petitioner
                                      /s/ Richard W. Pollack
Kenneth R. Kupchak,
Anna H. Oshiro,                       /s/ Steven S. Alm
Robert H. Thomas,
and Mark M. Murakami                  /s/ Karl K. Sakamoto
for respondent

